This morning, four patent cases, two from district courts and two from the PTAB. One of each is being submitted on the briefs and not being argued. And so we have three argued cases. The first being Intellectual Ventures v. T-Mobile, et al., 2017, 2601, 4810, 2018, 1027, 29, and 33. Mr. Black. Thank you, Your Honor. May it please the Court. When we wrote the briefs in this case almost a year ago, we asked the Court to do two things. One is to clarify that the Alice Step 1 analysis requires a close fit between the analysis of the abstract idea and what the claim is directed to. And the second was to confirm that there are fact issues that can arise at the Step 2 process, which should be dealt with in the same way as all other fact issues in federal litigation. My opponent accused us of the crime of arguing policy to this Court, to which we plead guilty. We did argue policy questions. We don't hear criminal cases. But the upshot, of course, is that since then the law has changed and been clarified, and that in Berkheimer, Atrix, and in the Anbanc decision, which I note we have all three strands of the decision there here present today, it is now clearly the law of the Court that fact issues that arise at Step 2 Alice have to be resolved in the same way as other fact issues in federal litigation. Now, the District Court here... So the Supreme Court has asked for the Solicitor's views on Berkheimer, so who knows where that's going to stand. That is true, Your Honor, and I know that my opponents have been active as amici in that brief, in that case, and perhaps win or lose, either side here may be looking at this case for Anbanc review, and we'll see what the Supreme Court does. But as it stands now, and there's certainly nothing in Alice which would be contrary to the position, there can be fact issues that arise at Step 2. So the claims here were reviewed under Alice both at the pleading stage and also at the summary judgment stage, correct? Two of the patents were reviewed and dismissed on a 12C motion and two at summary judgment. It happened that the way the case progressed that there were expert reports that were filed and which were available further on in the case and that were available to the court. Judge Stark refused to consider the expert reports on the 12C case. But didn't he actually say, I'm not supposed to consider expert reports for 12C, but even if I were to consider them, all the expert's doing is basically contradicting the face of the specification and that he felt that you can't raise a factual issue by contradicting the face of the specification. He did say that in one case. I don't think the point was correct. The specifications in these cases, and I'll go through each one. Each one is a little bit different, obviously. But it does create a bit of a conundrum. What are we doing on a 12C motion? It's supposed to be a basic motion to test the sufficiency of the pleading. Can the plaintiff, given the opportunity to develop discovery and try the case, produce sufficient facts to prevail? That's all. It's notice pleading under Rule 8 and Rule 12. What's happened is since the patent becomes part of the record, the court can look at the patent and then we get beyond that and we look at the official record, which includes the prosecution history. But the purpose of Rule 12 motion is just to test whether there's a possibility that under the most favorable reading to the plaintiff, they could someday prove out the case. So it should be relatively rare, unless the claim itself is so abstract as in Alice, which basically said disintermediated settlement, do it on a computer. That kind of a claim can still be dealt with at Rule 12. Excuse me. Go ahead. I was going to say, we've said in the past that even in 12B-6, the court has the right to find that the patent is ineligible. So 12C at least gets both pleadings in play, right? Right. It does, but the trouble is that there's no other area of the law where the defendant asserts an affirmative defense, in this case 101. We're entitled under Section 282 to a presumption of validity, and we then end up in an analysis, a factual analysis, about whether something was routine or conventional. My only point is that unless the face of the claim is so clear that all we really have is effectively a business method that has been being done on a computer, it's difficult to deal with these on a Rule 12 motion. With respect to the expert evidence, if expert evidence can be produced, that would be evidence to show that, in fact, the plaintiff's original pleading was acceptable. I agree it's a bit backwards from the normal litigation, but that's because this 101 analysis has evolved in a very strange way, as with the way we use Rule 12 motions. The issue before the court here, though, is that we have four patent specifications, six patents, which were tested under the law as it stood before Berkheimer and Atrix and some other developments in the court, and the district court's analysis cannot stand up to the current state of the law. The first patent at issue is the 752 patent, and that patent relates to the provision of directory assistance services to wireless customers. You don't have time to go through all six patents. I do not. Why don't you give us your strongest? Why don't you start with 737? 737, yes, Your Honor. The 737 patent, the district court said, was directed to the abstract idea of account management. Not so. If you look at Figure 2 of the patent, you'll see a network, which is defined, which includes several very specific pieces of equipment, a web server, a CCSN IG, which the district court defined to be a web server and a gateway specifically designed to interface with at least an integrated service control point that is part of a telephone network switch. For purposes of 101, we have real structures here. Now, there's a question about whether the... Aren't they all conventional? The elements may have been conventional, but the combination of those elements has to be tested under 103, not under 101, and that's why the patent was issued by the Patent Office. Surely the patent examiner was aware that web servers were known. Well, these are all old patents, pre-ATLAS. Yes. That's your problem. It is a problem, but, Your Honor, it's also 1996, from Verizon, and this is the first statement of a patent which involved the use of the web to change the telecommunications service. What this patent actually describes is a network, a structured network with multiple real physical embodiments to it, which are combined together in a new way. It describes accessing a network. It describes accessing a network. It's not a network that the inventor invented. It's an existing network. With all due respect, I disagree. The ISCP was a known piece of equipment. That's in the network switch. The web server was a known piece of equipment. But putting them together to create a CCSN IG gateway that would connect the two and allow users for the first time to, for instance, change their cell phone service on the fly in 1996, let's be clear, it's 1996 we're talking about, that was found to be invented. And our position is twofold. One is there's nothing abstract here. This is a network. It can be tested under Section 103, but not under 101. It's not an abstract idea. And second, even if we don't get over Step 1, there's a question about whether the combination of these two elements was routine and conventional, and that's something which we believe needs to be tried. Well, you say that this CCSN IG is some highly specialized system, but the patent doesn't describe it as highly specialized. It says over and over this is all just routine, conventional stuff, right? It says that web surfing is conventional. The patent says that making modifications to a service rather than just getting information, looking at web pages, was unusual at the time. And it says in claim, and the patent office agreed that as of 1996, that combining these two types of networks together, building a gateway to connect them, was inventive.  But our question here is how do we not get over 101? There's nothing abstract here. This isn't disintermediated settlement or a business method. There is a method claim, Your Honor, but in order to practice this method, you have to construct a network, including a CCSN IG, which had never been constructed before. No, you don't have to construct a network. You have to access a network. So we have a method, customer access to, and manipulation of services in the payment, and comprising of, one, accessing the network. You don't describe the network. Entering a request, displaying the request, accepting the request via customer contact. This just sounds like some form of messaging here. Well, we have, I guess it's an interesting question I haven't thought about before. If you have a method claim and it says do A, B, C, D, and E, how do we treat that under 101? I would suggest that since to practice the claim, you have to build a network, the network should be part of the claim for purposes of thinking about it. Where the network has as defined in a specific. Or perhaps you're claiming a network you didn't build. Well, they described it in Figure 2 of the patent and in the patent. And, again, that would be a 112 issue. But there are specific components here. There's a contact services node, internet gateway. It's a CCSN. It's something described in the patent as a control point for other parts of the network. The claim construction here, which was based on the intrinsic record, was that it has to be specifically configured to connect these two networks together. I get the argument that, well, when you're talking about a whole constructing a network or even talking about an actual computer, that that doesn't feel abstract. That was always my view. I still don't understand how it's abstract. But the law is, and we have said multiple times, that where all you're doing is using conventional computer components to do something, to accomplish something, that that can be abstract. So I understand the point, Your Honor, and my answer is as follows, as clearly as I can state it. If there are two components, both of which are conventional, but are put together in a new and inventive way, that satisfies 101. That activity, the combination, is what you would focus on, which is what we have with the CCSN IG. And that combination is not conventional or well understood. It's how we do a 103 analysis. 101 should be a more coarse gatekeeping function. So that's our position on that path. With respect to, are there any questions on that path? You are approaching your rebuttal time. Yes, Your Honor, I am. You can continue or save it as you wish. I think I will reserve the rest of my time for rebuttal. Thank you. Thank you. Mr. Finkelson, you want to take 14 minutes and leave one for Mr. Berroker? For my fast-talking colleague, Your Honor, Mr. Berroker has agreed to cede his one minute to me unless the panel has questions with respect to the 073 patent exhaustion issues. May it please the Court, Dave Finkelson for the appellees on the 101 issues here today. In the briefs and again in argument this morning, Ivy cloaks itself in this Court's recent decisions in Berkheimer and Atrix. Well, it does change the landscape a little bit, doesn't it? Your Honor, I don't believe it changes the landscape in a way that's relevant to the patents at issue here. That is to say, in denying on Bonk and Berkheimer, this Court indicated its view that it didn't mark a change in the law, that it simply stood for the proposition that it's step two of the Alice analysis. There may be factual issues in particular cases. Here, the district court judge found on the 312C patents that there were no factual issues, that the matter could be decided based on the pleadings and the matters attached to the pleadings in accordance with Rule 12C practice. What about then if we take a look at the claim we're looking at, the 737 patent, the CCSN-IG, that gateway, is that a factual issue, whether that's conventional or not? No, Your Honor, it's not a factual issue as to whether it's conventional or not. There was simply no evidence in the record on the 12C motion that would suggest otherwise. The complaint in this case was devoid of any allegations related to 101 whatsoever. Ivy did not file a motion to amend, and the specification of the patent itself, of the 737 patent, makes clear that the CCSN-IG is conventional equipment operating in a conventional way. Well, what about your response to your friend's argument that even if each of those parts would be conventional, that the ordered combination of those parts is not? That is indeed the law with respect to Mayo Step 2. It's not the case, however, Your Honor, with respect to these patents. Everything in the specification says there's an existing abstract idea of account management. We now have this new business opportunity of the Internet, and we're going to claim in a series of five functional steps performing that account management on the Internet. And with respect to the CCSN-IG in particular, where I differ with counsel, is not only does the specification of the 737 patent say that the web server is conventional, it says that the CCSN-IG is conventional, and it does that, Your Honor, by incorporating by reference the SMIC patent, which is of record at Appendix 26135, and was considered on the 12C motion because it was incorporated by reference. And at Column 7, Lines 10 to 24 of the SMIC patent, it indicates that the CCSN-IG is simply comprised of a conventional web server, a conventional gateway interface, and then later indicates a conventional ISCP. All of the equipment is conventional, and it's performing the abstract idea itself in the 737 patent of account management. Nothing in the ordered combination changes that. What about the 352 patent? It does seem to me that there is a lot of technological advancement going on here. I mean, how is the fact, I mean, obviously there was the ability to provide contact information, directory assistance in the past, but the system for setting it up so that there could be a mechanism for making sure that the payment occurred seems to be something different. I don't believe it is, Your Honor. Although I agree with you there is various pieces of equipment recited in Claim 1 of the 352 as well as in Dependent Claim 5. Each of those pieces of equipment are generic pieces of telephone equipment doing exactly what those generic pieces of telephone equipment typically do, not unlike, Your Honor, Alice. But they never did them before. I think the record, per the specification itself, is that those pieces of equipment always did what they're described to do in the patent itself. In other words, the three pieces of equipment that are recited in the 352 patent are a telephone, and there's certainly no assertion in the 352 patent that that's doing anything different than it ever did before. There's switching equipment, the MTSO, and there's the OSS. And the specification itself says that the switching equipment is off-the-shelf equipment. It specifically says that the OSS is off-the-shelf equipment. Those are the only three pieces of physical equipment recited in the claims. But why isn't this much like DDR holdings and NFISH in that what you're doing is you're taking this equipment and you are improving the operation of the equipment by allowing for a whole different billing capacity? It's different, Your Honor, because in DDR, whether at NFISH it's Step 1, or at DDR it's Step 2, those cases share a common principle, and that is as a whole the claims are directed to a problem that is unique to computers or to the Internet or to the technology in question. Here that's not the case. This is the use of an intermediary, an age-old practice, whether it's a telephone operator or a matchmaker or a private investigator, applied in the context of a telephone network. No, but you're ignoring the whole billing aspect of it. Yes, if all you're saying is can you call up and get a phone number and be connected to that phone number. But this is different. The billing aspect of it is something that you seem to ignore in your brief, and you're still ignoring here today. So why is that not an advancement to the system that was put on the computer before? I would suggest, Your Honor, that billing is itself an abstract idea and that the only step of the claims of the 352 patent that is directed to billing is the last step of Claim 1, which is recording the identity of the wireless communication terminal. And this Court has held, indeed, the Supreme Court held in Alice, that recordkeeping is a basic computer function. So whether it's discussing billing or the other steps of the claim, it's conventional equipment acting in a conventional way. And to your question about DDR, there's no how set forth in these claims. There's no technical specificity. That may be true. You're looking at, I guess, Step 2 here. But why wouldn't this claim survive Step 1 if it's providing limitations? So it's getting the abstract idea of messaging and requesting a particular number, and it actually is providing the steps by which that is done, and there's a significant amount of steps that's here. Why isn't this closer to MACRO, for example? It's not closer to MACRO, Your Honor, because as in Alice itself, what it recites is generic telephone equipment performing generic telephone functions. Forget about that. That's Step 2. Let's stay on Step 1. And don't we have here the criteria or the rules that are being applied that apply to the different steps of the application of the method? I think, Your Honor, we're directed at Step 1 to look at the claim as a whole and what it's directed to, and much like in the claim at issue in Alice where the court found it was directed to the use of an intermediary, that's precisely what's claimed here when you look at the claim as a whole. I don't disagree with you whatsoever that it's placed in the telephone environment, but this court has held time and again that that in and of itself is not sufficient at Step 1 to take what is otherwise an abstract idea and make it not so. Just as in Alice you had three pieces of generic computer equipment performing the generic computer functions of data transmission and data storage, so too does Claim 1 of the 352 patent contain three pieces of generic telephone equipment. Let's look at this part of the claim. Receiving information from the wireless communication terminal, identifying a particular listing from a directory of listings, would you say or can an argument be made that a particular list or a directory of listings is an algorithm? Excuse me, Your Honor, is a? Could it be argued effectively that this is describing an algorithm of sorts? It's a list of criteria. It's very specific, particular listings. I would suggest, Your Honor, that it merely says a number corresponding to the identified listing. There is no how recited in there. There's nothing with respect to that listing that takes it outside the realm of the conventional and, indeed, the specification. You didn't answer my question. Wouldn't this be a particular listing, taking the listing and then from a directory of listings, isn't that describing an algorithm of sorts? Your Honor, I don't believe it is in the context of the claim itself. It's describing the process of retrieving a listing without any detail in the claim that suggests that's done in any way. Then it has always been done, including in the way it was done for directory assistance call completion. How about receiving the destination number corresponding to the identified listing? In other words, this right here begins to sound to me a little bit like an algorithm. And if that's the case, then perhaps it survives step one, and we go to step two, and there we find this other information that we're talking about. And I understand your point, Your Honor. I would disagree, however, that it is such a description. It is instead just describing the generic functions that a directory assistance system does, and that this specification itself tells us it already did in the context of landline directory assistance call completion. In other words, your point is that the claim simply recites steps passing information back and forth and using old hardware. That's exactly right, Your Honor. And this Court has held both at step one and step two that the transmission of information in and of itself, the forwarding of data, is itself an abstract idea and is routine conventional activity. That's in the Affinity Labs direct TV case. In the briefing, it's also in the dealer track case. And that's exactly what is occurring here. There's no how given in the claims with respect to how that occurs. So both whether you're discussing it as a step one issue or as a step two issue, the forwarding of data cannot impart eligibility to the... Sure. I think this may tell us how. It's very specific in the different steps. It goes from one step to the next. It's describing the method. This is very much unlike the first patent that we talked about that doesn't describe the how. And it can't be that just getting information, using computer services to retrieve information, that in and of itself is patent ineligible. I mean, that's what all computers are doing, basically, right? Retrieving data and sending data. And this court has told us time and again that if that's all the computer is doing in the claim, then it is ineligible. So we look to the claim to see whether the claim does anything unconventional with those computers, at least at step two. And again, each of these steps are the steps performed here by computers. Computers in a telephone environment, a telephone, an operator service system, and a switch, doing what phones, operator service systems, and switches do according to the specification itself. The other point I would make, Your Honor, with respect to the 352 patent is IV points to expert testimony. This was one of the patents decided on summary judgment. It points to the testimony of its experts to argue that it supplies at least a fact issue with respect to inventive concept. But this court has held time and again that expert testimony that is contrary to admissions in the specification or that relates to unclaimed inventive concepts can't change the analysis under 101. That's the Smith and Nephew case, the Berkheimer case, the mortgage grader case, among others. Here, each of the alleged modifications that IV's expert points to don't actually find their way into the claims. IV's expert says this invention solves the call record problem because there are significant modifications to the switch and a software patch to the OSS. The claims don't have those. This patent has expired, right? So you're talking about damages. This patent has expired, yes, Your Honor. And with respect to the alleged problem of call location, IV's expert says that was solved in Claim 5 by making a required location-based eligibility determination. Well, Claim 5, like Claim 1, says nothing about an eligibility determination, much less a location-based one. So the expert testimony that is divorced from what's claimed cannot, we submit, create a factual issue. If I could speak for a minute with respect to the 490 and 306 patents, as we've indicated in the briefing, those are directed to the abstract idea  I wanted to draw the Court's attention to an admission in IV's gray brief at page 17 where they admit that the claims as a whole are directed to overcoming incompatible communication types, to the abstract idea itself through the use of a common format and not to a technological solution to the technological problem. IV itself says the invention was not in the method for converting multimedia content from an MMS message into an email or vice versa. The claims as a whole are directed to the abstract idea, and IV itself admits that there's no how in the claims in terms of how to do it. Couple that with IV's experts' admission. This is with the 490 patent? Yes, Your Honor. IV claims in their blue brief, it says that these claims are directed to concrete steps performed by a particular equipment that affect specific, tangible solution to a technological problem in a narrow field of technology. That doesn't sound to be the admission that you're saying that they made. I would argue, Your Honor, that that statement in the blue brief is one, irreconcilable with the statement in the gray brief, and two, more importantly, irreconcilable with the claims of the 490 and the 306 itself, which on their face recite no how whatsoever in terms of how there could be a technological solution claimed. Indeed, all IV says was the aha moment was using email to transmit multimedia messages, but IV's own expert in the summary judgment record admitted that it was already known to use email in exactly the way claimed. That's at Appendix 10474. Looking at 490, they do talk about what they view as the drawbacks and the difficulties in the prior art and say that they were attempting to overcome that. So are you saying that there was no advancement on the prior art? Your Honor, I think the fairest reading of the specification and of the gray brief statement is that the problem that existed in the prior art was one of incompatible communication systems, which, of course, is the age-old problem of translation, the age-old problem of converting messages to and from a common format that this Court has dealt with in cases like two-way media and synopsis. But IV, by its own admission, and it's consistent with the specification, does not allege that there is any invention here in the method of actually converting multimedia content from an MMS message into an email, nor could it, frankly, given its own expert's admission below, that email was already known for that purpose. I would draw the Court's attention to the IV Erie indemnity case, the reported one that was cited in the briefs where IV made a very similar argument to this Court. It argued that the fact that the claims there identified XML tags as the preferred format choice to use for indexing should have significance at Step 1 and also at Step 2, that that in and of itself could render the claim non-abstract or at least unconventional, and this Court rejected that argument at both Steps 1 and Step 2 in that case, and the argument with respect to email on the 490 and the 306 patent is similar in kind. Thank you, counsel, and we'll hear from Mr. Bureau for a minute. Thank you, Your Honor. Nothing to say? Your Honor, we only reserved the minute in case there were questions on the 073 patent, and since issues weren't raised and the panel doesn't have any questions, we're happy to move along. Okay. Mr. Black, you've got three minutes or so. Thank you, Your Honor. Let me just tick through the patents quickly because I've only got three minutes and we've got a lot of patents here. On the 737, the question is, does the combination of a CCSN IG, which is a web server specifically connected and designed to connect with an ISCP, is that not obvious over the prior art? That's 103. We intend to prove that. We're entitled to a presumption of validity. Or is it, as they say, so routine and conventional, that combination has to make the patent ineligible? That's a fact question. There was evidence in the record. We have a declaration. You're not conflating 103 with 101 here, are you? No. I am saying that if we have a legitimate 103 issue, we really can't have a 101 issue. It sounds like you're trying to argue that there could be a legitimate 103 issue and, therefore, we have a factual situation with respect to 101. You're not arguing that? I think that's correct, Your Honor. I don't think that... But the Supreme Court conceded that there is an overlap between these concepts and that that's a lot of what Step 2 is about. I agree with that. We're looking at routine, conventional. It's, by definition, a 103 inquiry. Right. Routine and conventional is a lower standard to get over for the patentee than not obvious in light of all the prior art. That's what the case law says. And my only point is that, like in 103, if the issue comes down to how inventive is the thing, putting two things together, that's a fact issue. There is evidence in the record submitted by I.V. It's the Williams expert declaration at 6871 to 78 where the expert explicitly said that that combination was new and inventive. And he did a DDR analysis. He did a machine or transformation test analysis. So the evidence is there. On the 352, this is not even... This is a claim that passes muster under Alice Step 1. We've addressed that in our brief. The changes that had to be made to the telecommunications networks in order to make this system work were found to be inventive, and certainly we believe that, given all the structure in that claim, that it passes muster under Alice Step 1. The 490 and 306 have been reduced by appellees to translation. That's a very broad and incorrect characterization to claim. There was a very specific problem presented to the inventors, which is that MMS was coming online. People around the world were using very different implementations, and someone came up with the idea of taking an MMS message, dissecting it, putting the text into an e-mail and the other objects of the MMS into attachments and using e-mail to do something that had never been done before, and then reconstructing the MMS message at the other end in whatever way the receiving entity wanted to do so so that it could transmit the MMS message to its customers. It's inventive, it's pretty neat, and we think there may be a 103 argument at trial, but again, there's something certainly that's not routine or conventional here. And finally, on the 200-957, little or nothing was said on that. We believe that it's on all fours with BASCM. And on that, I rest. Thank you, counsel. We'll take the case on revisement.